[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15358

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 2, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-21333-CV-JAL

ELIUTH M. ALVAREZ,

Plaintiff-Appellant,

versus

ROYAL ATLANTIC DEVELOPERS, INC.,
a Florida corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 2, 2010)

Before CARNES and HULL, Circuit Judges, and GOLDBERG,[*] Judge.

CARNES, Circuit Judge:

_____

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

Some people are impossible to please. No one can meet their standards and no matter how hard anyone tries, they find fault, criticize, and are unhappy with the result. They demand continuous perfection, which is more than any human being can deliver. The evidence in this Title VII case indicates that Heidi Verdezoto is one of those people. She is the Chief Financial Officer of two closely related, family-owned companies in Miami. As CFO, she supervises the controller of the companies and passes judgment on the performance of the person in that position. And it seems that the judgment she passes is always unfavorable.

The first controller, an Indian-American, was fired because he could not meet Heidi Verdezoto's standards. Likewise with the second controller, an Anglo-American. The third controller for the companies was our plaintiff, Eliuth Alvarez, a Cuban-American. Alvarez, like the two men of different ethnic backgrounds who came before her, was also going to be fired because she could not meet the Verdezoto standards. If Alvarez had been fired as soon as the decision to let her go was made, her sole claim would have been one for discriminatory discharge, and the district court's grant of summary judgment against her on that claim could easily have been affirmed on the basis of what we have had occasion to call the Vince Lombardi rule. See Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1301 n.1 (11th Cir. 2007) (explaining that no player could accuse the great

2

coach of discrimination because he treated all of them like dogs).

Alvarez was not, however, fired as soon as the decision was made to replace her. Instead, she was kept on in her position while efforts were being made to find a fourth controller, one who—hope springs eternal—might be able to satisfy Ms. Verdezoto. Alvarez got wind of the plans to replace her and wrote a letter of protest to her bosses, complaining, among other things, about what she perceived to be discrimination against her based on her national origin. The company admits that Alvarez was fired sooner instead of later because of that letter, which it concedes is protected conduct. Given that admission and concession, one would think Alvarez's retaliation claim would sail past summary judgment, although the damages remedy might be trimmed because she eventually would have been fired anyway.

But the retaliation claim did not drift, much less sail, past the shoals of summary judgment. It ran aground when the district court accepted as valid the company's four proffered reasons for firing Alvarez sooner instead of later. The two most interesting of those reasons are that it would be "awkward and counterproductive" to keep a disgruntled employee around and that Alvarez could vindictively use her position as controller to sabotage the company's operations. We have to decide if the company is entitled to summary judgment on those

3

grounds. If not, the district court's grant of summary judgment on the retaliation claim must be reversed.

## I.

The defendant, Royal Atlantic Developers, Inc., is a Miami real estate development company owned by the Verdezoto family. The Verdezotos, who are of Ecuadorian origin, also own a flower distributor, Royal Flowers International, Inc., which operates out of the same location. Edwin Verdezoto is CEO of Royal Atlantic and president of Royal Flowers, and he makes all final decisions for both companies. Heidi Verdezoto, his sister, is CFO of both companies and reports to him. Donald M. Darrach, the president and general counsel for Royal Atlantic, also reports to Edwin Verdezoto.

During the relevant time, the two companies had about 56 employees, a diverse ethnic group including Colombians, Cubans, Dominicans, Ecuadorians, Guatemalans, Haitians, Hondurans, Nicaraguans, Panamanians, Peruvians, Puerto Ricans, Venezuelans, and Anglos. The controller of Royal Atlantic, who also managed finances for Royal Flowers, reported to Heidi Verdezoto.[1] The controller was responsible for creating budgets and financial statements, projecting cash

---

[1] Although the duties of the position involved both companies, the controller was formally employed and paid by Royal Atlantic, which is the only entity sued in this case. For simplicity, we will refer to both companies as "Royal Atlantic" or "the company."

flows, reconciling bank accounts and monthly statements, arranging wire transfers, handling receivables and payrolls, dealing with property managers, managing several accounting employees, and supervising the two assistant controllers, Joel Underwood (who is Anglo) and Rosario Ruiz (who is Cuban).[2]

Heidi Verdezoto had "very high expectations" for the controller position and could not find anyone who could live up to them. In late 2005 and early 2006, Heidi hired and quickly fired two controllers.[3] Al Agrawal, who was Indian, lasted about three months, and Dennis Leach, who was Anglo, lasted about two months. The record does not contain any details about the job performance of Agrawal or Leach or the particular circumstances under which they were fired, aside from Heidi's explanation that neither of them "met [her] expectations."

On May 2, 2006, Eliuth Alvarez was hired as controller after a headhunter referred her to Royal Atlantic. The Verdezotos both interviewed Alvarez and jointly made the decision to hire her. Alvarez, an American citizen of Cuban origin, was a CPA with eighteen years of experience in accounting, auditing,

---

[2] Ruiz, who was fired around the same time as Alvarez, filed a separate lawsuit against Royal Flowers asserting similar claims of discrimination. After the district court denied the defendant's motion for summary judgment, the parties settled.

[3] From this point on, when talking about them separately we will refer to Heidi Verdezoto and Edwin Verdezoto by their first names, not as a sign of familiarity but for convenience, to minimize stilted language, and to avoid confusing references to two parties with the same last name.

finance, and controllership. When she arrived at the company, the controller position had been vacant for two months and the company was about a year behind in its accounting. One of her responsibilities was to bring the books up to date.

The parties offer sharply different evaluations of Alvarez's performance as controller. According to Royal Atlantic, she "never competently assumed the responsibilities" of the job. She excessively delegated work to her staff, with the result that they were "overwhelmed" and either missed deadlines or made errors in their assignments. She botched the implementation of a new software accounting program by failing to coordinate with and supervise her staff. When Heidi questioned her about these problems, she made excuses and blamed her subordinates. On one occasion, an important tax return document went missing. Alvarez blamed one of her assistants for losing it and insisted that he search his office for it while she stood there and watched; later, the missing document was found inside Alvarez's own desk. Alvarez was "aggressive and rude" to staff and to Heidi herself, and she was verbally reprimanded for that at least once. Alvarez mishandled cash flows, failed to purge monthly reports, fell behind on bank reconciliations, and did not pay vendors on time. Her work suffered from miscalculations and grammatical errors. Alvarez was frequently late to work, on one occasion causing the delay of a managers' meeting. Twice, one of her

6

assistants saw her sleeping at her desk. Heidi concluded within three months of hiring her that Alvarez was unfit for the job. She discussed the issue with Edwin, who agreed. They decided they would fire her as soon as they could hire a replacement.

Alvarez disputes the criticisms of her performance, insisting that she did her job well. She neither delegated too much, nor supervised too little. By the time she was fired, the company's accounts had been brought up to date. Heidi had no expertise in accounting, and the delays in payments to vendors were her own fault. No one complained about Alvarez's work during her initial three-month probationary period; instead, they complimented her. She was late to work only once or twice and that was because of traffic jams. She denies having lost the tax return document and speculates that someone else put it in her desk in order to frame her.

In late August or early September 2006, about four months after Alvarez had been hired, Heidi began searching for her replacement. Later, while reviewing resumes online, Heidi discovered that Alvarez had posted her own resume and was apparently looking for another job. In fact, Alvarez had applied on September 20 for a job at Miami-Dade Community College. Heidi contacted at least two potential replacements for Alvarez, Alex Sanchez and Philip Weikert. She did not

know the ethnic origin of either man.  Heidi spoke to Sanchez on the phone, discussed salary, and invited him to come into the office for an interview.  He never did.  Unbeknownst to Heidi, Sanchez was acquainted with Alvarez and tipped her off that Royal Atlantic was looking to replace her.[4]  The other prospect, Weikert, did interview in person for the job, and Heidi offered it to him only days after Alvarez was fired, but he never started work.[5]

It was in late September that Alvarez heard from Sanchez that she was going to be replaced.  A day or two after hearing that, Alvarez confronted Heidi and asked if she was planning to fire her.  Heidi later testified that she felt physically threatened by Alvarez, who is much larger than she is and was displaying an "aggressive demeanor."  Feeling pressured, Heidi lied to Alvarez, telling her the person they intended to fire was assistant controller Rosario Ruiz, not her.  Alvarez did not believe Heidi's explanation because the salary Heidi had offered Sanchez fit Alvarez's position, not Ruiz's lower-ranking one.

---

[4] The record does not indicate when Heidi discussed the job with Sanchez, but Alvarez heard from him about it two weeks before she was fired on October 4.

[5] The record shows that Weikert took a personality test as part of the application process on September 21, and Heidi sent him a letter offering him the job on October 6, with a proposed start date of October 30.  Weikert initially accepted, but for some reason things fell through.  According to Heidi, "after a few weeks it was decided between both parties that it was the best to not start the relationship."

Soon after that, on September 27, Alvarez had a run-in with Donald Darrach, Royal Atlantic's president and general counsel. Darrach confronted Alvarez in her office and questioned her about some financial statements he thought "made no sense." He raised his voice, and his "aggressive manner" apparently caused Alvarez to suffer a panic attack. Paramedics were summoned to the office, and Alvarez later sought psychiatric treatment.

Six days later, on October 3, 2006, Alvarez wrote a letter to Edwin in order to, as she said in the letter, "put in writing all the frustrations that are affecting my physical well-being." In the letter she told him that she was seeking psychiatric treatment after her recent anxiety attack. She complained that despite everything she had done to straighten out Royal Atlantic's finances, Heidi was planning to replace her. She said she did not believe Heidi's story that she was actually planning to fire Ruiz instead of her.

In this letter, for the first time, Alvarez complained of discrimination. "I have come to the conclusion," she told Edwin, "that the reason Rosario [Ruiz] and I are going to be fired is because of discrimination, because both of us are Cuban." She said that she had heard Darrach make derogatory comments about Cubans and had observed that Cubans such as herself, Ruiz, and two others had been "harassed and pressured a lot more" than other employees, and another Cuban had recently

9

been fired. "This is a clear case of discrimination not for Latin people as a whole but toward Cubans in general," she insisted. Alvarez called her letter "a formal complaint to the company for discrimination" and accused Darrach of "mistreatment due to racism and discrimination for my Cuban nationality." She closed the letter by saying "I hope that we can discuss this and look for an agreement."

Since she filed this lawsuit, Alvarez has elaborated only slightly on her allegations of anti-Cuban discrimination. She testified that one day she was walking past Darrach's office and overheard him say to a group of people that "Cubans are dumb." She did not hear anything he said before or after that, and could not remember when this had happened. Darrach denied having said any such thing. Alvarez claimed two other Cuban employees had told her that Darrach was prejudiced against Cubans and made jokes about them, but they never testified and she herself had heard only the one remark.[6] She never offered any statistics to back up her assertion that Cubans were fired at a higher rate than other employees.

---

[6] Ruiz testified at her deposition in this case that she never personally heard Darrach or anyone else in management make any derogatory remarks about Cubans. Brenda Garcia, who was the Human Resources Manager for the companies at the time and who is herself of Cuban descent, said in an affidavit that she had never received a discrimination complaint from any other employee. She believed that although Heidi "can be hard to work for and is, at times, unreasonable," Heidi was not prejudiced against Cubans or any other particular group.

10

Alvarez testified that she did not believe Edwin was prejudiced against Cubans, which is why she addressed her complaint to him. She did believe that Heidi was prejudiced, because Heidi acted "superior" and talked down to her. However, Alvarez conceded that Heidi behaved that way toward all the employees, not just the Cuban ones. Alvarez never heard Heidi say anything derogatory about Cubans.

When Edwin read Alvarez's October 3 letter, he immediately held a conference call with Heidi and Darrach. Edwin concluded from the letter that Alvarez was "unhappy at the company" and "wanted to leave." He thought her allegation of discrimination was "a lie" and did not question Darrach about it. Heidi saw Alvarez's invitation to "look for an agreement" as an attempt to extort a severance payment from Royal Atlantic. After reading the letter, Edwin and Heidi agreed to fire Alvarez immediately rather than waiting until they had found a replacement as they had planned to do.[7] She was fired the morning after she emailed the letter.

Both the Verdezotos admitted in their depositions that Alvarez's complaint affected the timing of her firing. This is Edwin's testimony:

---

[7] Edwin admitted that in Alvarez's case the company did not follow its progressive discipline policy, which normally provides for successive verbal and written warnings before an employee is terminated for misconduct.

11

Q. Now, once you saw [the letter], you made the decision that it was time to fire her immediately, correct?

A. Yes.

And this is Heidi's testimony:

Q. And if you hadn't received this document, you would eventually have fired her probably, but you wouldn't have fired her that day. Is that true?

A. True.

The two Verdezotos decided to "accelerate" the process of getting rid of Alvarez because, Edwin explained, she was "unhappy" there and they were unhappy with her. They felt that since Alvarez knew she was going to be fired anyway, it would be "awkward" for her to remain at the office and they would get little productive work from her. They also feared that she might use her access to the company's computers and bank accounts to sabotage its operations. Alvarez never attempted or threatened any sabotage, and their basis for fearing that she might try it was simply the sensitive nature of the job she held, as well as the statement in her letter that she was unhappy and was seeking psychiatric treatment.

On October 4, 2006, Heidi and Darrach informed Alvarez that she was fired. By the time this appeal was orally argued, more than three years later, Royal Atlantic still had not hired a new controller. Heidi took over some of the

12

controller's duties herself and gave the rest of them to assistant controller Joel Underwood, without promoting him.

## II.

After obtaining a right-to-sue letter from the EEOC, Alvarez filed this lawsuit against Royal Atlantic. She asserted four claims: (1) discrimination on the basis of her Cuban-American national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1); (2) retaliation in violation of 42 U.S.C. § 2000e-3(a); (3) discrimination in violation of the Florida Civil Rights Act, Fla. Stat. § 760.10(1)(a); and (4) retaliation in violation of Fla. Stat. § 760.10(7).[8] She alleged that Royal Atlantic had "engaged in an improper and illegal course of conduct designed to systematically eliminate [C]ubans including women" and that Royal Atlantic fired her in retaliation for her complaint about the discrimination.

After discovery, Royal Atlantic moved for summary judgment. It contended that Alvarez had failed to establish a prima facie case because her allegations did not raise an inference of discrimination, her poor performance showed that she was not qualified for the job, and she could not point to any similarly situated non-Cuban employees as comparators who were treated more favorably. The company also maintained that Alvarez failed to rebut the legitimate non-discriminatory

---

[8] The complaint initially contained a fifth count alleging negligent supervision, but Alvarez voluntarily dismissed it.

13

reason it offered for terminating her, which was that Heidi was dissatisfied with her poor job performance.

Royal Atlantic also argued that there was no causal connection between Alvarez's letter of complaint and her firing, and therefore no retaliation, because she was going to be fired anyway. Even if Alvarez's letter of complaint was a factor in the termination, Royal Atlantic insisted it had legitimate non-retaliatory reasons for firing her immediately, including: it would be "awkward and counterproductive" for Alvarez to remain in the office after she expressed such unhappiness with the job, and it feared that she might use her position as controller to sabotage the company's operations.

Alvarez responded that she was qualified for the job and that she was not required to identify comparators in order to make a prima facie case because Royal Atlantic's proffered explanation of poor job performance was pretextual. Alvarez insisted that she did her job well and said that she had never been disciplined before she made the complaint. She contended that she had presented both direct and circumstantial evidence showing that Royal Atlantic's decision to fire her was made in response to her letter of complaint, or at least that the letter caused the company to fire her immediately instead of waiting until it had hired a replacement.

The district court granted summary judgment in favor of Royal Atlantic. It concluded that Alvarez had failed to make out a prima facie case of discrimination under the framework for circumstantial evidence established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973), because she had not shown that she was replaced by a non-Cuban or that similarly situated non-Cuban employees were treated more favorably than she had been. Having concluded that Alvarez's discrimination claim failed on that ground, the court granted summary judgment for Royal Atlantic without reaching the question of whether its proffered reason for firing her was a pretext for discrimination.

On the retaliation claim, the district court decided that none of the Verdezotos' statements were direct evidence of retaliatory motive, but the fact that Alvarez was fired only one day after making the complaint did establish a causal link and a prima facie case. The court concluded, however, that Royal Atlantic had offered four legitimate non-retaliatory reasons for firing Alvarez: (1) her work performance was unsatisfactory and it had been planning to fire her anyway; (2) her letter made it clear she was not happy working there; (3) the Verdezotos thought it would be "awkward and counterproductive" to keep her around; and (4) they feared she might sabotage the company's operations. The court explained that Alvarez had the burden to show that each of these reasons was pretextual, which

15

she had failed to do.  Therefore, the court concluded, Royal Atlantic was entitled to summary judgment on the retaliation claim.  It also granted summary judgment to Royal Atlantic on the two state-law claims, for the same reasons.  This, of course, is her appeal.

## III.

We review de novo a district court's grant of summary judgment, applying the same legal standards as the district court.  Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  We will affirm if, after construing the evidence in a light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Jones v. Dillard's, Inc., 331 F.3d 1259, 1262–63 (11th Cir. 2003).  The district court's decision may be affirmed if the result is correct, even if the court relied upon an incorrect ground or gave a wrong reason.  Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 n.9 (11th Cir. 1998).

## IV.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or statistical proof." Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008).

Alvarez offers no statistical evidence showing that Cubans were fired at a higher rate than other nationalities. Nor does she attempt to argue that Darrach's "Cubans are dumb" remark rises to the level of direct evidence of discrimination, even if we assume, as we must for summary judgment purposes, that he actually said it. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) ("[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." (quotation marks and citation omitted)).

Lacking direct evidence, Alvarez must prove her discrimination claim circumstantially. We evaluate such claims using the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089 (1981). Wilson, 376 F.3d at 1087. Under that framework the plaintiff must first establish a prima facie case of discrimination, typically by showing that she was a qualified member of a protected class and was subjected to

17

an adverse employment action in contrast to similarly situated employees outside the protected class.  See id.  The methods of presenting a prima facie case are flexible and depend on the particular situation.  Id.

Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally.  Id.  The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action.  Id.  If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination.  Id. Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against her.  Burdine, 450 U.S. at 253, 101 S.Ct. at 1093; Wilson, 376 F.3d at 1088.  Showing only that the employer's proffered reason is false does not necessarily entitle a plaintiff to get past summary judgment.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S.Ct. 2097, 2109 (2000) (stating that even if plaintiff disproved employer's proffered explanation, employer would still be entitled to judgment as a matter of law if record "conclusively revealed some other, nondiscriminatory reason" for its decision); Chapman, 229 F.3d at 1025 n.11 (applying Reeves in summary judgment context).

**A.**

Alvarez is Cuban-American, and like everyone else, belongs to a protected group by virtue of her ethnicity. Her credentials and prior experience qualified her for the job, as evidenced by the fact that Royal Atlantic hired her in the first place. Royal Atlantic then fired her in spite of the fact that she was qualified. Of course, the fact that Alvarez was qualified to perform her job competently does not mean that she actually did so, an issue that is sharply contested by the parties. Qualifications and experience that get a candidate hired for a job and performance that is satisfactory enough for her to keep it are two different things. Because her job performance is bound up in the inquiry into whether Royal Atlantic's proffered reason for firing her was a pretext for discrimination, we will consider it at the pretext stage of the analysis. See Holifield v. Reno, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997). It matters not whether Alvarez has made out a prima facie case if she cannot create a genuine issue of material fact as to whether Royal Atlantic's proffered reasons for firing her are pretext masking discrimination. See Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1228 (11th Cir. 2002); see also Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1236 & n.5 (11th Cir. 2004) (district court erred in concluding the plaintiff had not established a prima facie case, but summary judgment was proper anyway because the record showed that

the plaintiff had failed to establish pretext). For that reason, we will assume that Alvarez has established a prima facie case of discrimination.

**B.**

If a prima facie case is established, the burden shifts to the employer to rebut the resulting presumption of discrimination by producing evidence that it acted for a legitimate non-discriminatory reason. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff. Burdine, 450 U.S. at 254, 257, 101 S.Ct. at 1094, 1095–96. However, the defendant's response must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. at 255–56, 101 S.Ct. at 1095. The burden then shifts back to the plaintiff to show that the employer's proffered reason was not its true reason, which merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against her. Id. at 256, 101 S.Ct. at 1095.

Alvarez may satisfy her burden either by offering evidence that Royal Atlantic more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows

20

that the real motive was a non-proffered reason that is non-discriminatory.  See id.;

Reeves, 530 U.S. at 148, 120 S.Ct. at 2109.  To show pretext, Alvarez must

demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could find them unworthy of credence."  Combs v. Plantation

Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted).  "A plaintiff is

not allowed to recast an employer's proffered nondiscriminatory reasons or

substitute [her] business judgment for that of the employer.  Provided that the

proffered reason is one that might motivate a reasonable employer, an employee

must meet that reason head on and rebut it, and [she] cannot succeed by simply

quarreling with the wisdom of that reason."  Chapman, 229 F.3d at 1030.

Alvarez argues at length that Royal Atlantic's complaints about the quality

of her work were unfounded, but the fact that she thinks more highly of her

performance than her employer does is beside the point.  The inquiry into pretext

centers on the employer's beliefs, not the employee's beliefs, and to be blunt about

it, not on reality as it exists outside of the decision maker's head.  See Holifield,

115 F.3d at 1565.  The question is not whether it really was Alvarez's fault that

assignments were not completed on time, or whether she did delegate excessively,

or whether she was aggressive and rude to her colleagues and superiors, or whether

21

she actually lost an important document or truly did fall asleep at her desk. The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about Alvarez as cover for discriminating against her because of her Cuban origin. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (inquiry is limited to whether employer believed employee was guilty of misconduct and if so, whether that was reason behind discharge; that employee did not actually engage in misconduct is irrelevant).

In analyzing issues like this one, "we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002); cf. Wilson, 376 F.3d at 1092 ("Whether [plaintiff's] conduct was insubordinate is not an issue for this Court to referee."). The question to be resolved is not the wisdom or accuracy of Heidi's conclusion that Alvarez's performance was unsatisfactory, or whether the decision to fire her was "prudent or fair." See Rojas, 285 F.3d at 1342. Instead, "our sole concern is whether unlawful discriminatory animus motivate[d]" the decision. Id. (quotation marks and citation omitted). Alvarez argues in essence that she did her job as well as could reasonably be expected, given the mess the company's accounts were already in when she got there. But that is no different from arguing

that Heidi should have been satisfied with Alvarez's performance, or that it is unfair for her not to have been satisfied. That is not the question. Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class. We do not sit as a "super-personnel department," and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive. Chapman, 229 F.3d at 1030. That is true "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." Id. (quotation marks and citations omitted); see also Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1399 (7th Cir. 1997) (listing, among "embarrassing" but non-actionable reasons under Title VII, "nepotism, personal friendship, the plaintiff's being a perceived threat to his superior, a mistaken evaluation, the plaintiff's being a whistleblower, the employer's antipathy to irrelevant but not statutorily protected personal characteristics, a superior officer's desire to shift blame to a hapless

23

subordinate . . . or even an invidious factor but not one outlawed by the statute under which the plaintiff is suing; . . . or there might be no reason").

Alvarez's burden is to show not just that Royal Atlantic's proffered reasons for firing her were ill-founded but that unlawful discrimination was the true reason. See Reeves, 530 U.S. at 148, 120 S.Ct. at 2109 (showing only that proffered reasons are false does not necessarily get plaintiff past summary judgment). Here, Royal Atlantic's proffered reason for firing Alvarez was that her performance was unsatisfactory. Even if Alvarez could show it was satisfactory by some objective standard, she has not raised a genuine issue of material fact as to the true reason she was fired. The record establishes beyond any genuine dispute that Alvarez, like her two non-Cuban predecessors, simply failed to satisfy Heidi Verdezoto. That may not be a good reason for firing Alvarez (or her two predecessors), it may not be a reason that flatters Heidi, and it may not be a reason that Royal Atlantic wants to put in its promotional brochures, but it is a non-discriminatory reason. So far as job discrimination law is concerned, Heidi was within her rights to insist on a controller who could whip the company's books into shape overnight while accommodating her own prickly personality and performing every task perfectly, even if there was little or no chance she would ever find such a miracle worker.

She was free to set unreasonable or even impossible standards, as long as she did not apply them in a discriminatory manner.

The fact that each previous controller was fired under similar circumstances is strong evidence that however unattainable Heidi's standards may have been, she applied them indiscriminately to Cubans and non-Cubans alike. Although the record contains no details about their performances, we do know that Agrawal, a non-Cuban, lasted only about three months before he was fired for not meeting Heidi's standards. And we know that Leach, a non-Cuban, lasted only about two months before he was fired for the same reason.[9] Alvarez, at least, established a new record of longevity in the position, staying on board for about four months before the decision was made to fire her for not satisfying Heidi. Alvarez points to her testimony that Heidi displayed a "superior" attitude and "talked down" to her, but that does not suggest discrimination when, as Alvarez conceded, Heidi behaved exactly the same way toward all her employees, the Cubans and non-Cubans alike.

This is a classic example of the Vince Lombardi rule: someone who treats everyone badly is not guilty of discriminating against anyone. See Baldwin, 480 F.3d at 1301 n.1. As we said in the Baldwin case, "It would be paradoxical to

_____

[9] Because it is Alvarez's burden to show that the "very high expectations" proffered reason is pretextual, any lack of detail in the record about the job performances of Agrawal and Leach does not help her. See Chapman, 229 F.3d at 1024–25.

25

permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct." Id. at 1301. Heidi's dissatisfaction with and firing of the two non-Cuban men who held the controller position before Alvarez is strong evidence that no one could please her regardless of their nationality. She was indiscriminately persnickety.

The only evidence Alvarez has offered that there was more to the decision to get rid of her than Heidi's perfectionism is the single stray remark "Cubans are dumb," which was not made by one of the ultimate decision makers, and Alvarez's own conclusory observation that Cubans "seem to get terminated at a very high rate without justification," which she never backed up with any specifics.[10] That evidence is too weak to raise a genuine fact issue. See Reeves, 530 U.S. at 148, 120 S.Ct. at 2109 (employer would be entitled to judgment as a matter of law if plaintiff created "only a weak issue of fact" as to whether proffered reason was untrue, and there was "abundant and uncontroverted independent evidence that no discrimination had occurred"); Rojas, 285 F.3d at 1342–43 (stray remark "isolated and unrelated to the challenged employment decision" was insufficient by itself to establish genuine fact issue on pretext). We conclude that summary judgment in

---

[10] Alvarez also testified that other employees told her they heard similar discriminatory remarks, but she did not offer any affidavits or deposition testimony from them. Her testimony about what she heard secondhand is inadmissible hearsay, which cannot be used to defeat summary judgment. See Rojas, 285 F.3d at 1342 n.3.

favor of Royal Atlantic was proper on the discrimination claim, even though our reasons for reaching that conclusion are different from the district court's. See Turlington, 135 F.3d at 1433 n.9.

## V.

Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To make a prima facie showing of retaliation, the plaintiff must show: (1) that she engaged in statutorily protected conduct; (2) that she suffered adverse employment action; and (3) that there is "some causal relation" between the two events. See McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008). Alvarez's October 3, 2006 letter to Edwin Verdezoto, which described itself as a "formal complaint" of discrimination, is statutorily protected conduct.

There is no doubt that plans were underway to fire Alvarez even if she had not complained of discrimination as she did in her letter. Although Heidi denied those plans when Alvarez confronted her about them in late September, Alvarez justifiably did not believe her denial. And neither could a reasonable jury believe

27

the denial. It is undisputed that, as Alvarez had learned, Heidi had begun searching for a new controller weeks before Alvarez sent her letter of complaint. So, the letter could not have caused the decision to fire Alvarez.

Still, the evidence establishes that the letter did cause Alvarez to be fired the day after she emailed it, which is sooner than she otherwise would have been, and that is enough to establish the adverse action element of her retaliation claim. The loss of a salary for a period of months, weeks, or days is a "materially adverse" action which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006) (quotation marks omitted); see id. at 72–73, 126 S.Ct. at 2417–18 (suspension without pay for 37 days was materially adverse even though employee later received back pay); Reynolds v. CSX Transp., Inc., 115 F.3d 860, 868 (11th Cir. 1997) (concluding that "almost a week" without pay was adverse action), vacated on other grounds, 524 U.S. 947, 118 S.Ct. 2364 (1998).

The district court concluded that Alvarez's retaliation claim failed because Royal Atlantic offered several legitimate reasons, other than her letter of complaint, that caused it to fire Alvarez. Among the reasons the district court accepted was that Royal Atlantic had been planning to fire Alvarez anyway. That

28

reason begs the question of when she would have been fired but for the letter. As we have explained, it is undisputed that sending the letter caused her to be fired sooner. Edwin testified that the letter caused him to fire her immediately, and Heidi testified that but for the letter Alvarez would not have been fired as soon as she was. See supra at 11–12. So, the first proffered reason cannot support summary judgment for Royal Atlantic.

The second and third reasons Royal Atlantic gave for firing Alvarez, which are closely related, are that her letter made it clear that she was unhappy working for the company and the Verdezotos thought it would be "awkward and counterproductive" to keep her around. Well, sure. Anyone who complains about unlawful discrimination is not likely to be a happy camper. Only a masochist would relish being mistreated because of her race, sex, or nationality. And it will always be "awkward," and perhaps "counterproductive" in the business sense, to work with people who complain that you have discriminated against them. But recognizing those concerns as legitimate, non-retaliatory reasons to fire someone who complains about unlawful discrimination would do away with retaliation claims and the protection they provide to victims of discrimination. That, in turn, would be "counterproductive" to the purpose of the statutory provisions prohibiting discrimination.

Royal Atlantic's final proffered reason for firing Alvarez after it received her letter of complaint gives us more pause. The company said that it had to get rid of Alvarez when it did because the Verdezotos were afraid that she might vindictively use her position as controller, with access to company computers and bank accounts, to sabotage the company's operations. This reason can be viewed in two ways. One way is that the company did not fire her because she complained about discrimination, but because her letter of complaint revealed that she was mad at the company, which acted in order to remove an angry person from a sensitive position instead of for retaliatory reasons. Another way to view the company's position is as an admission that it fired Alvarez because she complained, which would ordinarily constitute prohibited retaliation; but there should be an affirmative defense when the termination is necessary to protect the company or others from retaliatory acts by the employee. In other words, the company had to take preemptive action, which otherwise might be considered retaliation, in order to avoid the employee's improper retaliation against the company or others because of her belief that she had been discriminated against. The difference would be the motive or goal of the company's action: whether it was to discourage or punish complaints about discrimination or to protect the company from improper actions by a disgruntled employee.

However it is characterized, we are not prepared to dismiss the idea out of hand. A few hypotheticals will show why. Suppose an employee with reason to believe that she has been discriminated against works in the control room of a nuclear power plant, and in her letter complaining of discrimination says that: "I'm mad as hell and I'm not going to take it anymore!" Or suppose she is a pilot and makes that statement in her letter of complaint. Or suppose she was not in a position to endanger the public, but her letter complaining of discrimination makes it clear that she is psychologically unstable and a danger to those who work around her. Discrimination laws do not require that their goals be pursued at the cost of jeopardizing innocent life or that employers tolerate a serious risk that employees in sensitive positions will sabotage the company's operations. We are confident that if an employer removes an employee because of a reasonable, fact-based fear of sabotage or violence, the anti-retaliation provisions of our laws will not punish that employer for doing so.

The only issue we have before us in this case is whether Royal Atlantic was entitled to summary judgment on this ground—whether there is no genuine issue of material fact that Royal Atlantic had a reasonable basis to believe that unless she were fired immediately Alvarez might sabotage its operations. The record does not conclusively establish the company had reason to believe that she might do so.

31

Her letter contains no threats against the company or anyone else, nor does it provide a reasonable basis for inferring that Alvarez would try to disrupt operations. The company did not show that there was no means short of firing Alvarez that it could have used to protect itself from the sabotage it feared, such as reassigning her to other duties until it found a replacement controller. And, of course, there is no evidence that Alvarez's continued employment posed a physical danger to the Verdezotos or their other employees. The company was not entitled to summary judgment on this ground.[11]

We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint. The record does establish that Royal Atlantic had legitimate non-discriminatory reasons to fire Alvarez before she complained, and it remained free to act on those reasons afterward. The one thing Royal Atlantic could not lawfully do is fire her earlier than it otherwise would have because she complained about discrimination, at least not unless something in her complaint or the manner in which she made it gave the company an objectively reasonable basis to fear that unless Alvarez was fired she

---

[11] Alvarez never sought summary judgment in her favor on her retaliation claim, and we do not venture any opinion on whether she was entitled to it, because that issue is not before us.

would sabotage its operations or endanger others.  See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1191 (11th Cir. 1997).

Unless Royal Atlantic convinces a jury that it had a reasonable basis for fearing that unless it fired her immediately Alvarez would sabotage its operations or harm others, and there was no less drastic means of reliably preventing that other than firing her, Alvarez will be entitled to damages for the length of time she would have remained on the job if she had not sent the October 3, 2006 letter complaining of discrimination.  The Verdezotos both testified that their initial plan had been to keep Alvarez on board until they had lined up her replacement.  How quickly they would have done that if Alvarez had not accelerated matters by making her complaint is a question of fact.  We learned at oral argument that the controller position remained vacant for at least three years after Alvarez was fired.  The reason for that delay, and whether or not the Verdezotos would have changed their plans and fired Alvarez at some point during that time if she had not sent her complaint letter, is unclear from the record.  That issue can be resolved at trial, if necessary.

## VI.

Alvarez also makes parallel discrimination and retaliation claims under the Florida Civil Rights Act of 1992. See Fla. Stat. § 760.10. Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework, see Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) (citing Florida case law), the state-law claims do not need separate discussion and their outcome is the same as the federal ones. See Albra v. Advan, Inc., 490 F.3d 826, 834 (11th Cir. 2007) (federal case law on Title VII is applicable to construe the FCRA); Byrd v. BT Foods, Inc., 948 So. 2d 921, 925 (Fla. 4th DCA 2007) (same). It follows that Royal Atlantic is entitled to summary judgment on the state-law discrimination count but not on the state-law retaliation count.

## VII.

We affirm the district court's grant of summary judgment in favor of Royal Atlantic on Counts I and III. We reverse the grant of summary judgment on Counts II and IV, and remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**